IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Action No. |
| *v.* | 1:21-CR-00143-ELR-CCB |
| VICTOR HILL | |

**CONSOLIDATED RESPONSE TO DEFENDANT'S AMENDED MOTION TO DISMISS THE INDICTMENT AND STRIKE SURPLUSAGE AND DEFENDANT'S AMENDED MOTION FOR A BILL OF PARTICULARS**

The United States of America, by Kurt R. Erskine, Acting United States Attorney, and Brent Alan Gray and Bret R. Hobson, Assistant United States Attorneys for the Northern District of Georgia, files this Consolidated Response to Defendant's Amended Motion to Dismiss the Indictment and Strike Surplusage (Doc. 33) and Defendant's Amended Motion for a Bill of Particulars (Doc. 32).

## <u>Introduction</u>

On July 29, 2021, a federal grand jury in the Northern District of Georgia returned a superseding indictment against Defendant Victor Hill, charging him with five counts of willfully depriving individuals of their constitutional right to be free from unreasonable force by law enforcement officers, in violation of 18 U.S.C. § 242.  (Doc. 24.)  Specifically, the grand jury accused Hill, who was then in charge of the Clayton County Jail, of causing five individuals to be strapped into restraint chairs without any legitimate nonpunitive governmental purpose and for a period exceeding that justified by any legitimate nonpunitive

governmental purpose.  (*Id.*)  The grand jury found that Hill caused the victims to be strapped into restraint chairs when they were not resisting law enforcement and posed no threat to themselves or others.  (*Id.*)  And the grand jury found that Hill caused the victims to be strapped down for hours, resulting in some of the men urinating on themselves.  (*Id.*)

Hill moves to dismiss the indictment.[1]  In sum, he argues that he did not have fair warning that his conduct was criminal.  (*See generally* Docs. 20 & 33.)  Hill also moves to strike four paragraphs from the indictment, arguing that accusing him of being present when he or one of his officers struck one of the strapped-down detainees is irrelevant and inflammatory.  (Doc. 33 ¶ 2.)  Finally, Hill moves for a bill of particulars, seeking more details about the physical pain and bodily injury the victims suffered.  (Doc. 32 at 5.)  This Court should deny Hill's motions because (1) ample precedent provided him fair warning that his charged conduct was unconstitutional, (2) the four paragraphs he seeks to strike are relevant to the charges against him and not inflammatory or unfairly prejudicial, and (3) his request for a bill of particulars seeks evidentiary detail of which he has already been apprised through discovery or to which he is not entitled.

---

[1] Hill moved to dismiss the original indictment on July 12, 2021 (Doc. 20) and incorporated his arguments stated therein when moving to dismiss the superseding indictment on August 19, 2021 (Doc. 33).

## Background[2]

The facts as alleged in the superseding indictment are as follows: At all times material to the superseding indictment, Hill was the elected sheriff of Clayton County, Georgia. (Doc. 24 ¶ 3.) As sheriff, Hill was in charge of the Clayton County Sheriff's Office ("CCSO"). (*Id.*) He also administered the Clayton County Jail, which housed arrestees, pretrial detainees awaiting trial, and convicted inmates awaiting transfer to state prison. (*Id.* ¶¶ 1-3.)

Hill regularly received training, including use-of-force training that instructed force may not be used to punish an inmate. (*Id.* ¶ 4.) The CCSO's "Inmate Restraint Chair" policy, which Hill had approved, stated that "a restraint chair may be used by Security staff to provide safe containment of an inmate

---

[2] When considering a motion to dismiss an indictment, the Court may not dismiss the indictment on a determination of facts that should have been developed at trial and must view the facts alleged in the indictment in the light most favorable to the government to determine whether they were sufficient to charge the offense as a matter of law. *See United States v. deVegter*, 198 F.3d 1324, 1326-27 (11th Cir. 1999); *see also United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. 2004) ("Because Salman was properly indicted, the government is entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29. A motion for acquittal under Rule 29 is the proper avenue for contesting the sufficiency of the evidence in criminal cases because there is no explicit authority to grant a pre-trial judgment as a matter of law on the merits under the Federal Rules of Criminal Procedure." (internal citation omitted)).

exhibiting violent or uncontrollable behavior and to prevent self-injury, injury to others or property damage when other control techniques are not effective." (*Id.* ¶ 5.)  Consistent with the Fourteenth Amendment's Due Process Clause, the CCSO policy emphasized that use of the restraint chair "will never be authorized as a form of punishment." (*Id.* ¶ 6.)  Nevertheless, Hill caused five pretrial detainees at the jail to be strapped into restraint chairs and left there for hours even though they posed no threat to anyone:

<u>Victim J.A.</u>

On February 2, 2020, J.A. allegedly assaulted two women during a dispute about who was next in line at a Clayton County grocery store. (*Id.* ¶ 7.)  More than three weeks later, on the afternoon of February 25, 2020, J.A. was arrested by Forest Park Police Department officers and CCSO deputies without incident. (*Id.* ¶ 8.)  Clayton County records indicate J.A. was unarmed, not under the influence of drugs, and offered no resistance. (*Id.*)  A short time later, J.A. was booked into the Clayton County Jail as a pretrial detainee pending trial on charges stemming from the grocery store incident. (*Id.* ¶ 9.)  During the booking process, J.A. was escorted by a group of deputies and correction officers to the fingerprinting area where Hill confronted J.A. (*Id.* ¶ 10.)

During their exchange, Hill asked J.A. what J.A. had been doing in Clayton County on the day of the assault. (*Id.* ¶ 11.)  J.A. replied, "It's a democracy, sir. It's the United States."  Hill responded, "No, it's not.  Not in my county." (*Id.*)  When J.A. asked whether he was entitled to a fair and speedy trial, Hill replied, "Roll that chair around here. You stay out of Clayton County, you understand

me?  You sound like a dummy."  (*Id.* ¶ 12.)  When J.A. again asked whether he was entitled to a fair and speedy trial, Hill replied, "You entitled to sit in this chair, and you're entitled to get the hell out of my county and don't come back. That's what you're entitled to.  You sound like a damn jackass.  Don't you ever put your hand on a woman like that again.  You're fortunate that wasn't my mother or grandmama or you wouldn't be standing there.  Now, sit there and see if you can get some damn sense in your head."  (*Id.* ¶ 13.)

During J.A.'s interaction with Hill, J.A. was surrounded by law enforcement personnel at all times, was handcuffed most of the time, and never posed a threat to anyone.  (*Id.* ¶ 14.)  Following the interaction, Hill caused J.A. to be strapped into a restraint chair without any legitimate nonpunitive governmental purpose and for a period exceeding that justified by any legitimate nonpunitive purpose. (*Id.* ¶¶ 15, 51.)

<u>Victim C.H.</u>

On April 26, 2020, C.H., who had just turned seventeen years old, allegedly vandalized his family home during an argument with his mother and then left. (*Id.* ¶ 16.)  Shortly thereafter, a CCSO deputy apprehended C.H. nearby without incident and turned C.H. over to the custody of the Clayton County Police Department (CCPD).  (*Id.* ¶ 17.)  Clayton County records indicate C.H. was unarmed, not under the influence of drugs, and offered no resistance.  (*Id.*)  The deputy, a CCSO supervisor, then spoke with Hill on the phone, texted Hill a photograph of C.H. handcuffed and seated in a CCPD vehicle, and had the following text message exchange with Hill:

Hill: How old is he?

Deputy: 17

Hill: Chair

(*Id.* ¶ 18.)

A few hours later, very early on April 27, 2020, C.H. was booked into the jail as a pre-trial detainee pending trial on charges stemming from the incident at his home.  (*Id.* ¶ 19.)  Although C.H. had been compliant with law enforcement during and after his arrest and never posed a threat to anyone, Hill caused C.H. to be strapped into a restraint chair without any legitimate nonpunitive governmental purpose and for a period exceeding that justified by any legitimate nonpunitive purpose.  (*Id.* ¶¶ 20, 53.)

<u>Victim J.H.</u>

On the morning of April 27, 2020, J.H. was arrested by the Jonesboro Police Department following a domestic disturbance with possible drug use.  (*Id.* ¶ 21.) At the police station after his arrest, J.H. fell out of a chair after apparently pretending to pass out.  (*Id.* ¶ 22.)  J.H. was transported to Southern Regional Medical Center for evaluation.  (*Id.*)  While being treated at the hospital, J.H. refused treatment and left the building.  (*Id.* ¶ 23.)  When Jonesboro police officers later re-apprehended J.H. outside his grandmother's house that afternoon, J.H. did not cooperate or comply with officers' commands and had to be carried down some steps and placed into a patrol vehicle.  (*Id.* ¶ 24.)  Clayton County records indicate that J.H. was unarmed, not under the influence of drugs, and offered no resistance.  (*Id.*)  In the patrol vehicle, J.H. again appeared to feign

6

unconsciousness but offered no resistance.  (*Id.* ¶ 25.)  Shortly thereafter, still during the afternoon of April 27, 2020, J.H. was booked into the Clayton County Jail as a pretrial detainee pending trial on charges stemming from the domestic disturbance.  (*Id.* ¶ 26.)

Upon J.H.'s arrival at the jail, although J.H. was not combative and never posed a threat to anyone, Hill caused J.H. to be strapped into a restraint chair without any legitimate nonpunitive governmental purpose and for a period exceeding that justified by any legitimate nonpunitive purpose.  (*Id.* ¶¶ 27, 55.)  During his hours in the restraint chair, J.H. was not allowed to go to the restroom and urinated on the restraint chair.  (*Id.* ¶ 28.)

While C.H. and J.H. were both strapped in restraint chairs near each other, Hill confronted them.  (*Id.* ¶ 29.)  Referring to C.H., Hill said, "You know what he did yesterday?"  He went and destroyed his mother's house yesterday.  That what this asshole right here did." (*Id.*)  Addressing both C.H. and J.H., Hill then opined, "I think both of y'all are just assholes that need a man to kick y'all in the ass and y'all be okay.  I don't think y'all are bad people."  (*Id.* ¶ 30.)  Still addressing both C.H. and J.H., Hill added, "Now, I'm going to tell you something.  If I hear about you [C.H.] messing with your mama's house again, if I hear about you [J.H.] fighting cops and faking and going to the Southern Regional and then walking out and pulling out the IV, I'm a sit your ass in that chair for sixteen hours straight.  Do you understand me?  I need to hear from both of y'all that y'all not gonna show y'all's ass in my county no more."  (*Id.* ¶ 31.)

7

<u>Victim G.H.</u>

G.H. and a CCSO deputy had a payment dispute over some landscaping work G.H. did for the deputy in Butts County, Georgia. (*Id.* ¶ 32.) The work and dispute were unrelated to the deputy's employment with the CCSO. (*Id.*) After learning about the dispute, Hill called G.H. on April 23, 2020. (*Id.*) During the call, Hill identified himself as the Clayton County Sheriff and asked G.H. why he was harassing his deputy. (*Id.* ¶ 33.) G.H. replied that Hill should tell his deputy to pay his bill and added, "you can go fuck yourself." (*Id.*) Unsure whether the caller had actually been the sheriff, G.H. used FaceTime to call back several times until Hill answered and removed a mask he was wearing. (*Id.* ¶ 34.) After the FaceTime calls, Hill texted G.H., warning him not to call or text anymore. (*Id.* ¶ 35.) G.H. responded via text, "So this is Victor Hill correct." (*Id.*) Hill responded with a second text warning for G.H. not to call or text him anymore. (*Id.*)

Although G.H. did not call or text again, the next day Hill instructed a CCSO deputy to swear out an arrest warrant against G.H. for harassing communications. (*Id.* ¶ 36.) The next day, April 24, 2020, Hill texted G.H., "[T]his is Sheriff Victor Hill. We have a warrant for your arrest. Would you like to turn yourself in or have my Deputies find you?" (*Id.* ¶ 37.) G.H. did not respond. (*Id.*)

The next morning, April 25, 2020, Hill again texted G.H., "My Deputies are actively looking for you. We have not and will not agree for you to turn yourself in when you want to. Turn yourself in today." (*Id.* ¶ 38.) Meanwhile, Hill had

sent a fugitive squad armed with handguns and AR-15 rifles to Butts County in an attempt to arrest G.H. on the misdemeanor arrest warrant.  (*Id.* ¶ 39.)

After retaining a lawyer, G.H. turned himself in at the CCSO during the evening of April 27, 2020.  Clayton County records indicate that G.H. was unarmed, not under the influence of drugs, and offered no resistance.  (*Id.* ¶ 40.) Shortly thereafter, G.H. was booked into the Clayton County Jail as a pretrial detainee pending trial on the harassing communications charges.  (*Id.* ¶ 41.) Surveillance footage from the jail shows G.H. interacting with jail personnel for more than half an hour, during which time he appeared cooperative and compliant, before Hill arrived and confronted him.  (*Id.* ¶ 42.)  Immediately upon Hill's arrival, although G.H. was surrounded by law enforcement personnel, remained compliant, and never posed a threat to anyone, Hill caused G.H. to be strapped into a restraint chair without any legitimate nonpunitive governmental purpose and for a period exceeding that justified by any legitimate nonpunitive purpose.  (*Id.* ¶¶ 43, 57.)

<u>Victim W.T.</u>

On the morning of May 11, 2020, W.T. was arrested in Clayton County by a Georgia State Patrol trooper for speeding and driving with a suspended Florida driver's license.  (*Id.* ¶ 44.)  The trooper transported W.T. to the Clayton County Jail without incident.  (*Id.*)  After W.T. arrived at the jail, he was met by Hill and members of the CCSO Scorpion Response Team (SRT).  (*Id.* ¶ 45.)  Although W.T. was not physically aggressive and never posed a threat to anyone, Hill caused J.H. to be strapped into a restraint chair without any legitimate nonpunitive

governmental purpose and for a period exceeding that justified by any legitimate nonpunitive purpose. (*Id.* ¶¶ 45, 59.)

Soon after W.T. was strapped into the restraint chair and while W.T. was still in the presence of Hill, a CCSO employee covered W.T.'s head with a hood. (*Id.* ¶ 46.) Just after W.T.'s head was covered with a hood, W.T.'s face was struck twice by what W.T. believed to be a fist. (*Id.* ¶ 47.) The strikes caused W.T. to bleed. (*Id.*) At some point later, while still strapped in the restraint chair, W.T. was able to get the attention of a CCSO officer. (*Id.* ¶ 48.) The officer walked over to W.T. and asked if W.T. was "the one they beat up?" (*Id.*) The officer covered the blood on W.T.'s jail uniform with a white paper smock and took a photograph of W.T. (*Id.*) During his hours in the restraint chair, W.T. was not allowed to go to the restroom and he urinated on the restraint chair. (*Id.* ¶ 49.)

<u>Charges</u>

The grand jury charged Hill with five counts, one as to each victim discussed above, for violating 18 U.S.C. § 242. (*Id.* ¶¶ 50-59.) The indictment alleged in each count that Hill, "while acting under color of law, willfully deprived [each victim] of the right, secured and protected by the Constitution and laws of the United States, not to be deprived of liberty without due process of law, which includes the right to be free from the use of unreasonable force by law enforcement officers amounting to punishment." (*Id.* ¶¶ 51, 53, 55, 57, 59.) Each count accused Hill of causing the victim "to be strapped into a restraint chair without any legitimate nonpunitive governmental purpose and for a period exceeding that justified by any legitimate nonpunitive governmental purpose."

(*Id.*)  Finally, each count alleged that the offense caused physical pain and resulted in bodily injury to the victim.  (*Id.*)

**Argument and Citation of Authority**

**1.  Ample precedent provided Hill fair notice that strapping unresisting detainees into restraint chairs violated their constitutional rights.**

"Section 242 makes it a crime for a state official to act 'willfully' and under color of law to deprive a person of rights protected by the Constitution."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *see also United States v. Brown*, 934 F.3d 1278, 1294 (11th Cir. 2019) ("To convict Brown of deprivation of rights under color of law, 18 U.S.C. § 242, the government had to prove that Brown acted (1) willfully and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States." (internal quotations and citations omitted)).

Criminal liability under § 242 "may be imposed for deprivation of a constitutional right if, but only if, in the light of pre-existing law the unlawfulness under the Constitution is apparent."  *United States v. Lanier*, 520 U.S. 259, 271-72 (1997) (internal quotation marks and alterations omitted).  That is, prior judicial decisions must give "fair warning" that a defendant's actions violated constitutional rights.[3]  *Id.* at 272.

---

[3] "[T]he standard for determining the adequacy of that warning [is] the same as the standard for determining whether a constitutional right was 'clearly established' in civil litigation under § 1983."  *Hope*, 536 U.S. at 740.

Regarding the adequacy of the warning, the prior judicial decisions need not have "applied the right at issue to a factual situation that is 'fundamentally similar'" to the factual situation being prosecuted. *Id.* at 269. Rather, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Id.* at 271 ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning . . . ."). For instance, even in the absence of a prior decision, there is no question that officers beating a suspect to obtain a confession or welfare officials selling foster children into slavery would violate § 242. *Id.* The U.S. Supreme Court reiterated this principle in *Hope*, rejecting the argument that only "materially similar" precedent could provide fair warning, and explaining that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741.

Among the rights protected by the Constitution and § 242 is the right to be free from excessive force by law enforcement officers in various settings: "While the Fourth Amendment prevents the use of excessive force during arrests, and the Eighth Amendment serves as the primary source of protection against excessive force after conviction, it is the Fourteenth Amendment that protects those who exist in the in-between—pretrial detainees." *Piazza v. Jefferson Cty., Ala.*, 923 F.3d 947, 952 (11th Cir. 2019) (internal citations omitted). Until somewhat recently, the Fourteenth Amendment standard that applied in this Circuit resembled the Eighth Amendment standard, which requires a finding

"not only that a jail official deliberately used excessive force, but also that the official did so 'maliciously or sadistically for the very purpose of causing harm.'" *Id.* (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005), *overruled by Kingsley v. Hendrickson*, 576 U.S. 389 (2015)). "All that changed a few years back, though, when the Supreme Court clarified that, unlike a prisoner bringing an Eighth Amendment excessive-force claim, a pretrial detainee raising a Fourteenth Amendment claim needn't prove an officer's subjective intent to harm but instead need show only that 'the force purposely or knowingly used against him was objectively unreasonable.'" *Id.* (quoting *Kingsley*, 576 U.S. at 396-97).

Nevertheless, cases applying the old standard and the Eighth Amendment standard remain relevant for providing fair warning of when a particular use of force is objectively unreasonable: "Because proving *both* that the force applied in a given situation was objectively excessive *and* that it was applied 'maliciously or sadistically for the very purpose of causing harm' will almost invariably be more difficult than proving only that the force used was objectively excessive, these cases continue to provide pertinent examples of excessive force in the pretrial-detainee context." *Id.* at 953 n.7; *see also Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996).

Although the law in this Circuit has not established "[t]he precise point at which a seizure ends (for purposes of Fourth Amendment coverage) and at which pretrial detention begins (governed until a conviction by the Fourteenth Amendment)" *Hicks v. Moore*, 422 F.3d 1246, 1253 n.7 (11th Cir. 2005), this Court

need not determine at this phase whether the five victims in this case were arrestees (protected by the Fourth Amendment) or pretrial detainees (protected by the Fourteenth Amendment) because the law in this Circuit is clearly established under both the Fourth and Fourteenth Amendments (as well as the Eighth Amendment) that force may not be used on an unresisting detainee. *See Piazza*, 923 F.3d at 956 n.10.

In the context of pretrial detainees' rights under the Fourteenth Amendment, the U.S. Supreme Court has explained that "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). "[S]uch 'punishment' can consist of actions taken with an 'expressed intent to punish.'" *Id.* at 398 (quoting *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)). "[I]n the absence of an expressed intent to punish," such punishment can be established by showing "that the actions that are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" *Id.* (quoting *Bell*, 441 U.S. at 561).

While the Eleventh Circuit recently held that an express intent to punish coupled with an objectively reasonable use of force cannot sustain an excessive-force claim, *see Crocker v. Beatty*, 995 F.3d 1232 (11th Cir. 2021), Hill's stated intent to punish some of the victims is still relevant to the analysis in this case because it goes to whether Hill's use of force was objectively reasonable in the first place. Viewed in the light most favorable to the Government, Hill's admissions on a recording that several of the detainees were being placed into restraint chairs

14

solely because of their prior alleged criminal conduct is evidence that Hill's actions were not related to a legitimate nonpunitive purpose.  Thus, Hill's statements regarding his intent as to those victims are evidence that the use of force was objectively unreasonable.  And even putting aside Hill's stated intent to punish, his actions objectively demonstrate that he applied excessive force when *no* legitimate nonpunitive purpose supported placing the victims in restraint chairs.

In *Piazza*, a case published before any of Hill's violations of the victims' rights in this case, the Eleventh Circuit reiterated the principle the Supreme Court laid out in *Bell* and *Kingsley*: "if force used against a pretrial detainee is more severe than is necessary to subdue him or otherwise achieve a permissible governmental objective, it constitutes 'punishment' and is therefore unconstitutional."  *Piazza*, 923 F.3d 947, 952 (11th Cir. 2019).  The *Piazza* Court then explained how we know when force is reasonable versus when it is excessive in relation to its purpose: "our decisions make one thing clear: 'Once a prisoner has *stopped resisting* there is no longer a need for force, so the use of force thereafter is disproportionate to the need.'"[4]  *Id.* at 953 (quoting *Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008)).

---

[4] While out-of-Circuit cases cannot themselves provide fair warning to a defendant in our Circuit, it is nevertheless worth noting that the Tenth Circuit similarly concluded in 2013, largely based on the Supreme Court's 1979 decision in *Bell,* that use of a restraint chair "without *any* legitimate penological purpose" is a clearly established violation of the Fourteenth Amendment.  *Blackmon v. Sutton*, 734 F.3d 1237, 1242 (10th Cir. 2103).

Applying this principle, the *Piazza* Court held that a prison guard violated an inmate's Fourteenth Amendment Due Process rights by tasing him when he was no longer resisting. *Id.* at 954-55. The Court then held that prior decisions had given the officer fair warning that his conduct was unconstitutional. *See id.* at 955-57. Rather than cite a factually similar case, the Court relied on the well-established general principle that prison guards may not use force on a compliant prisoner: "for decades our decisions have embraced and reiterated the principle that an officer may not continue to use force after a detainee has clearly stopped resisting." *Id.* at 955. And in contradiction to Hill's arguments in his motion to dismiss, the Eleventh Circuit emphasized that those prior decisions provided fair warning despite not involving a taser:

> To be clear, it is no answer to say that *Danley* involved pepper spray, *Skrtich* kicks and punches, *Williams* four-point restraints, etc.—and that none of those cases concerned the use of a taser specifically. It's true, of course, that to defeat qualified immunity a rule must be specific enough that an act's unlawfulness "follow[s] immediately from the conclusion that the rule was firmly established," *Wesby*, 138 S. Ct. at 590 (citation omitted). But we have never suggested that the longstanding prohibition on a jail officer's use of force on an incapacitated detainee turns on as fine a point as the particular weapon deployed.

*Piazza*, 923 F.3d at 956.[5]

---

[5] Notably, *Piazza*'s reference to four-point restraints in its list of uses of force cases that would have put the *Piazza* defendant on notice belies Hill's argument that no case establishes that restraint chairs even constitute a use of force. *See also Campbell v. Sikes*, 169 F.3d 1353, 1376-78 (11th Cir. 1999) (discussing various types of restraints within its use-of-force analysis). And like in *Hope*, discussed below,

The *Piazza* Court further noted that this same principle governs Fourth Amendment excessive force cases, but the Court chose not to rely on those cases "[g]iven the ample Fourteenth Amendment precedent prohibiting jail officers from using force on an unresisting detainee." *Id.* at 956 n.10.  Indeed, under the Fourth Amendment excessive-force standard, the force used must be "reasonably proportionate to the need for that force." *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002).  Furthermore, where an officer does not have the right to make an arrest in the first place, any force is excessive.  *See Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998) ("Neither Thornton nor Cravey was suspected of having committed a serious crime, neither posed an immediate threat to anyone, and neither actively resisted arrest.  Yet, on the facts viewed in the light most favorable to the plaintiffs, the officers used force in arresting both Thornton and Cravey.  The officers grabbed Thornton and wrestled him to the ground, and threw Cravey on the hood of one of the patrol cars before handcuffing him.  Under the circumstances, the officers were not justified in using *any* force, and a reasonable officer thus would have recognized that the force used was excessive.").

The Supreme Court's decision in *Hope* provided additional notice that the unjustified use of a restraint device is unconstitutional.  In *Hope*, the Supreme Court held that prison guards who handcuffed a prisoner to a hitching post for

---

it is relevant to this determination that Hill's own use-of-force report forms included "Restraint Device" as one "Type of Force."  *See, e.g.*, Exhibits 1 and 2, attached hereto.

an extended period with no justification had violated the Eighth Amendment. *Id.*; *see also id.* at 747 (noting that the violation was exacerbated by the lack of proper clothing, water, or bathroom breaks, but that these additional facts did not form the basis of the Court's decision).  The *Hope* Court explained that although no prior case had addressed the limits to permissible uses of hitching posts specifically, it sufficed that prior decisions squarely held that several forms of corporal punishment ran afoul of the Eighth Amendment, including "handcuffing inmates to the fence and to cells for long periods of time, and forcing inmates to stand, sit or lie on crates, stumps, or otherwise maintain awkward positions for prolonged periods."  *Id.* at 742 (internal alteration omitted) (quoting *Gates v. Collier*, 501 F.2d 1291, 1306 (5th Cir. 1974)).

The *Hope* Court further held that the reasoning, but not the holding, of another case, *Ort v. White*, 813 F.2d 318 (11th Cir. 1987), provided additional fair warning.  *Id.* at 743.  Although *Ort* had addressed very different facts (*i.e.*, withholding water until an inmate complied with a reasonable directive to perform his assigned duties) and ultimately held that the prison guard there did not violate the Eighth Amendment because he ceased punishing the prisoner after the prisoner complied, the *Hope* Court explained that *Ort* still provided fair warning by establishing the general premise that "physical abuse directed at a prisoner *after* he terminates his resistance to authority would constitute an actionable eighth amendment violation."  *Id.* (internal alterations omitted) (quoting *Ort*, 813 F.2d at 324).

18

Finally, the *Hope* Court noted that "[r]elevant to the question whether *Ort* provided fair warning to respondents that their conduct violated the Constitution is a regulation promulgated by [the State Department of Corrections]," which instructed guards to discontinue hitching when a noncompliant prisoner said he was ready to go to work.  *See id.* at 743-44.  The Court explained that the prison guards' course of conduct in regularly ignoring this regulation "provides equally strong support for the conclusion that they were fully aware of the wrongful character of their conduct."  *Id.*  at 744.

So too, here.  While Hill focuses his motion on his allegation that no case in the Eleventh Circuit has directly held the unjustified use of restraint chairs to be an unconstitutional use of force on pretrial detainees, he ignores the Supreme Court's explicit direction that such a direct holding is not required.  Instead, just as the *Ort* case provided the *Hope* defendants notice of what conduct would *not* have crossed the line into unconstitutional behavior, the *Williams* case cited in *Piazza* provides notice of when four-point restraints may properly be applied in a custodial setting.  In *Williams*, which was decided under an Eighth Amendment standard, the Court approved of prison guards placing an inmate in four-point restraints because they did so only after the inmate had become enraged, yelled, threatened bodily harm to officials, spit on them, and caused other inmates to join in the commotion within the segregation unit, which was reserved for those inmates who had demonstrated by their prior conduct that they were the most difficult, unruly, and unmanageable members of the prison population.  *Williams v. Burton*, 943 F.2d 1572, 1574-75 (11th Cir. 1991).  Then, in approving the guards'

decision to maintain the restraints for more than a day, the Court deferred to the guards' judgment only after explaining:

> *Once restraints are initially justified*, it becomes somewhat problematic as to how long they are *necessary to meet the particular exigent circumstances which precipitated their use*. The basic legal principle is that once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments, and any abuse directed at the prisoner after he terminates his resistance to authority is an Eighth Amendment violation.

*Id.* at 1575–76 (emphasis added); *see also Campbell*, 169 F.3d at 1376-77 (holding that application of restraints to a convicted inmate did not constitute excessive force where "the urgent need for force was readily apparent" because "the undisputed facts show [the inmate] posed a serious threat to herself and to others"). This opinion made clear to Hill and any other prison official that when there are no exigent circumstances, the use of four-point restraints violates the Constitution.

Here, Hill caused all five victims to be strapped into restraint chairs for hours when there were no exigent circumstances. As alleged in the superseding indictment, Hill ordered each of the victims into restraint chairs even though they "never posed a threat to anyone." (Doc. 24 ¶¶ 14, 20, 27, 43, 45.)

Numerous cases put Hill on notice that using force on unresisting detainees violated the Constitution. First, *Hope* made clear that restraining an inmate by cuffing them to a hitching post "for a period of time extending that required to address an immediate danger or threat" is a violation of the Constitution. *Hope*,

536 U.S. at 747.  And *Hope* held this based on (1) other cases having held that it was constitutionally impermissible to restrain inmates by cuffing them to fences and cells for long periods of times or forcing them into awkward positions for prolonged periods, *id.* at 742-43 (citing *Gates*, 501 F.2d at 1306), and (2) the general principle that "physical abuse directed at a prisoner *after* he terminates his resistance to authority" constitutes a violation of the Constitution, *id.* at 743 (internal alterations omitted) (quoting *Ort*, 813 F.2d at 324).

Later, in the context of pretrial detainees, *Piazza* reiterated that the Fourteenth Amendment prohibits jail officers from using force, regardless of the type of force, on unresisting detainees.  *Piazza*, 923 F.3d at 955-57 & n.10.  And the reasoning of *Wilson* established that using four-point restraints on an inmate is justified only by exigent circumstances and only for as long as the restraints remain "necessary to meet the particular exigent circumstances which precipitated their use."  *Wilson*, 943 F.2d at 1574-76.

Simply put, "[g]iven the ample Fourteenth Amendment precedent prohibiting jail officers from using force on an unresisting detainee," *Piazza*, 923 F.3d at 956 n.10, in addition to essentially identical precedent in the Eighth and Fourth Amendment contexts, no reasonable officer could have believed that strapping unresisting detainees into restraint chairs for hours was constitutional.  Moreover, Hill's conduct in regularly ignoring his own policy that the restraint chair was not to be used to punish prisoners "provides equally strong support for the conclusion that [he was] fully aware of the wrongful character of [his]

conduct." *Hope*, 536 U.S. at 744.  Accordingly, this Court should deny Hill's motion to dismiss the indictment.

## 2.  The allegations Hill seeks to strike from the superseding indictment are relevant to the charges against him and neither inflammatory nor unfairly prejudicial.

"A motion to strike surplusage from an indictment should not be granted 'unless it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial.  This is a most exacting standard.'"  *United States v. Awan*, 966 F.2d 1415, 1426 (11th Cir. 1992) (internal alterations omitted) (quoting *United States v. Huppert*, 917 F.2d 507, 511 (11th Cir.1990)).

Here, Hill moves to strike four paragraphs from the superseding indictment that allege that after victim W.T. was strapped into a restraint chair on Hill's orders, W.T.'s head was covered with a hood and struck while Hill was present (Doc. 24 ¶¶ 46-47), that an officer took a photograph of W.T.'s injuries (*id.* ¶ 48), and that W.T. was not allowed to use the restroom while in the chair, which resulted in him urinating on the chair (*id.* ¶ 49).  All of these allegations are relevant to establishing that Hill's actions were not rationally related to a legitimate nonpunitive governmental purpose and/or that his actions appeared excessive in relation to such purpose.  How the victims were treated while in the restraint chairs bears on whether use of the chairs was to respond to an exigent circumstance or instead was unjustified punishment of unresisting detainees.  Furthermore, these allegations are relevant to establishing Hill's intent.  After all, for Hill to be convicted of violating § 242, the government must prove that he

acted "willfully," and "the defendant's subsequent conduct may be considered if it supports a reasonable inference as to his prior intent."  *Brown*, 934 F.3d at 1296 (quoting *United States v. House*, 684 F.3d 1183, 1296 (11th Cir. 2012)).  Moreover, the allegations are not inflammatory or unfairly prejudicial.  The jurors are entitled to know how the victims were treated at Hill's orders and/or in his presence when they evaluate whether he violated the victims' constitutional rights.  Accordingly, this Court should deny Hill's motion to strike these paragraphs of the indictment.

**3. Hill's request for a bill of particulars seeks evidentiary detail of which he has already been apprised through discovery or to which he is not entitled**

In his Amended Motion for a Bill of Particulars, Hill requests that this Court order the government to answer this question with more specificity than is alleged in the indictment: What is the specific "physical pain" and "bodily injury" suffered by J.A. (Count One), C.H. (Count Two), J.H. (Count Three), and G.H. (Count Four)?  (Doc. 32 at 7).

As Hill points out, a violation of 18 U.S.C. § 242 is a felony if the acts result in bodily injury to the victim.  The statute does not define the term "bodily injury," but the Eleventh Circuit has held that bodily injury includes "(A) a cut, abrasion, bruise, burn or disfigurement; (B) physical pain; (C) illness; (D) impairment of a function of a bodily member, organ or mental faculty; or (E) any other injury to the body, no matter how temporary."  Eleventh Circuit Pattern Jury Instructions (Criminal Cases) § O8 annotations and comments (2020) (citing *United States v. Myers*, 972 F.2d 1566, 1572 (11th Cir. 1992)).

In each of the five counts of the superseding indictment, the grand jury has alleged that Hill's actions "caused physical pain and resulted in bodily injury to [the victim]." (Doc. 24 at ¶¶ 51, 53, 55, 57, 59).   Under Eleventh Circuit authority, a victim's physical pain alone is sufficient to prove bodily injury to support a felony conviction under 18 U.S.C. § 242.   While it will be up to trial jurors to determine whether each victim suffered any physical pain or other bodily injury from being strapped in a restraint chair for hours without bathroom breaks, the allegations contained in the indictment adequately "inform the defendant of the charge[s] against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of later prosecution for the same offense." *United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985).

Additionally, the government has produced discovery materials beyond the relatively narrow requirements of Rule 16 of the Federal Rules of Criminal Procedure that further support the facts alleged in the superseding indictment and provide specific details about when, where, and how Hill is alleged to have committed the crimes charged.  The government has also provided detailed reports from law enforcement agents that memorialize statements by each of the victims who have clearly stated that Hill's actions caused them physical pain and, in some instances, greater injury.

Nevertheless, Hill claims "nothing in the discovery explains why [he] faces felony charges in Counts 1-4 — that is, how those alleged victims suffered physical pain or bodily injury." (Doc. 32 at 4).  Between the specific acts alleged

24

in the fourteen-page speaking indictment and the discovery that has been provided, Hill is sufficiently apprised of the charges against him that he will have to defend at trial.[6]

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  Rule 7(f) authorizes courts to direct the government to file a bill of particulars when needed "'to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and

---

[6] FBI 302 summaries of agent interviews with the alleged victims named in Counts One through Four (J.A., C.H., J.H., and G.H.) have been provided to Hill. According to those FBI records, each victim detailed some amount of pain and injury.  The FBI 302s include the following statements: 1) "The restraint chair physically injured [J.A.] and caused him pain."; "Specifically, [J.A.] felt pain in both of his hands and legs."; "After being removed from the restraint chair, [J.A.] had visible red marks on both of his wrists and ankles."; 2) "[C.H.] explained to the interviewing agents that being confined to the restraint chair with his hands/arms secured behind his back was torture.  As a result of being confined in the restraint chair two times, he felt pain in his arms, back, and ankles during and after confinement."; "[C.H.] believed that he was confined to the restraint chair for a total of at least 10 hours."; "[C.H.] explained he had difficulty walking when he was removed from the chair the second time."; "[C.H.] received visible marks on both of his wrists and ankles from the straps that secured him in the restraint chair."; 3) "During his time in the chair, J.H. suffered a sprained wrist from the handcuffs being too tight."; 4) "At approximately 3:30AM [G.H.] was unstrapped from the restraining chair.  His hands were black and blue and he could barely walk.; "[G.H.] told interviewers his hands were still numb."; [G.H.] had a lot of cramping from his shoulders being pulled back.  He could feel a pull between his neck and back right shoulder and his right arm was numb to the wrist.  His left arm was numb from the elbow to the wrist.  He was experiencing a shocking sensation through his nerves on the left arm."

to enable him to plead double jeopardy in the event of a later prosecution for the same offense.'" *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986) (quoting *Cole*, 755 F.2d at 760.  Though this Court enjoys broad discretion to grant or deny a Rule 7(f) motion, "[b]ills of particulars are not routinely granted."  *United States v. Leiva-Portillo*, No. 1:06-CR-350-WSD, 2007 WL 1706351, *7 (N.D. Ga. June 12, 2007).  This Court's decision will be reversed only if Hill can show that he was "actually surprised at trial and thereby incurred prejudice to his substantial rights." *Cole*, 755 F.2d at 760.

Rule 7 does *not*, however, entitle a defendant to a roadmap of the government's evidence or its theory of proof.  *See United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980) (a bill of particulars "is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial").[7]  "Nor is the government required to provide defendants with all overt acts that might be proven at trial."  *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir. 1986); *see also United States v. Kendall,* 665 F.2d 126, 135 (7th Cir. 1981) (citing *United States v. Freeman*, 619 F.2d 1112, 1118 (5th Cir. 1980)) ("The defendant's constitutional right is to know the offense with which he is charged, *not to know the details of how it will be proved.")* (emphasis added); *United States v. Scrushy*, No. CR-03-BE-530-S, 2004 WL 483264, *9 n.5 (N.D. Ala. March 3, 2004) ("there is a difference between being surprised

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981.

by the charge and being surprised by the evidence supporting a charge . . . Rule 7 does not give a defendant the right to insist that he be made aware of all of the evidence the government may use against him so that he literally is not 'surprised' by anything at trial").

To justify a bill of particulars, a defendant must show that the requested information is *necessary,* as opposed to merely useful, for trial preparation. *Anderson*, 799 F.2d at 1441 ("A bill of particulars, properly viewed, supplements an indictment by providing the defendant with information *necessary* for trial preparation."); *United States v. Giffen*, 379 F. Supp. 2d 337, 346 (S.D.N.Y. 2004) ("[t]he ultimate test in deciding whether a bill of particulars should be ordered is whether the information sought is necessary, as opposed to helpful, in preparing a defense"). To determine whether further exposition of the charges is necessary through a bill of particulars, this Court can look beyond the four corners of the indictment to see if the requested information "is already available through other sources," including discovery. *United States v. Martell*, 906 F.2d 555, 558 (11th Cir. 1990) (a defendant is not entitled to a bill of particulars with respect to information already available through other sources); *United States v. Kirkham*, 129 F. App'x 61, 72 (5th Cir. 2005) (concluding that the "voluminous discovery" provided by the government "obviated the need for a bill of particulars"); *United States v. Acosta*, 807 F. Supp. 2d 1154, 1268 (N.D. Ga. 2011) (collecting cases, and noting that courts may consider other sources, including fact discovery materials, to determine whether the defense has been provided with information to prepare for trial).

Hill's Motion for a Bill of Particulars should be denied because he is seeking evidentiary detail to which he is not entitled.  The indictment alleges specific acts committed by Hill.  Additionally, the government has provided Hill with discovery that sufficiently advises him of the conduct for which he is being prosecuted, enables him to prepare his defense without surprise at trial, and enables him to plead double jeopardy in the future.  *See Cole*, 755 F.2d at 760.

## **Conclusion**

For the foregoing reasons, this Court should deny all of Hill's motions.

Respectfully submitted,

KURT R. ERSKINE
    *Acting United States Attorney*


/s/BRENT ALAN GRAY
    *Assistant United States Attorney*
    Georgia Bar No. 155089
    Brent.Gray@usdoj.gov


/s/BRET R. HOBSON
    *Assistant United States Attorney*
    Georgia Bar No. 882520
    Bret.Hobson@usdoj.gov

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Drew Findling
Marissa Helene Goldberg
The Findling Law Firm, P.C.
Suite 600, One Securities Centre
3490 Piedmont Road NE
Atlanta, GA 30305
drew@findlinglawfirm.com
marissa@findlinglawfirm.com

Lynsey Morris Barron
Miller & Martin PLLC
1180 W. Peachtree St. NW
Suite 2100
Atlanta, GA 30309
lynsey.barron@millermartin.com

*Attorneys for Defendant Victor Hill*

September 20, 2021

/s/ BRET R. HOBSON
BRET R. HOBSON
*Assistant United States Attorney*