**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    **v.**

**VICTOR HILL,**

    **Defendant.**

**CRIMINAL ACTION NO.
1:21-CR-143-ELR-CCB**

## ORDER AND FINAL REPORT AND RECOMMENDATION

Defendant Victor Hill is charged with five counts of willfully depriving detainees at the Clayton County Jail of their constitutional rights in violation of 18 U.S.C. § 242. (Doc. 24). Defendant moved to dismiss the indictment, (Doc. 20), and for a bill of particulars, (Doc. 21). After he filed his motions, the grand jury returned a superseding indictment. (Doc. 24). Defendant then filed an amended motion to dismiss the superseding indictment and to strike surplusage from that document, (Doc. 33), as well as an amended motion for a bill of particulars, (Doc. 32). Counsel for the parties presented oral argument regarding the motion to dismiss the superseding indictment on November 29, 2021. (Doc. 43). For the reasons stated below, the motion for a bill of particulars as to the original

indictment, (Doc. 21), is **DENIED AS MOOT**, and the motion for a bill of particulars as to the superseding indictment, (Doc. 32), is **DENIED**. Further, I recommend that the motion to dismiss the original indictment, (Doc. 20), be **DENIED AS MOOT** and that the motion to dismiss the superseding indictment and to strike surplusage, (Doc. 33), be **DENIED**.

## I.   The Superseding Indictment

The superseding indictment alleges that Defendant was the Sheriff of Clayton County, Georgia and that the Clayton County Sheriff's Office (CCSO) was the law enforcement agency responsible for staffing, maintaining, and running the Clayton County Jail (the jail). (Doc. 24 at 1). It generally alleges that Defendant caused five people, all of whom were detainees at the jail, to be strapped into a restraint chair without any legitimate governmental purpose. *Id.* at 2–10.

The superseding indictment alleges that J.A. encountered Defendant during the booking process at the jail. *Id.* at 3. J.A. asked Defendant whether he was entitled to a fair and speedy trial, and Defendant told him, "You entitled to sit in this chair, and you're entitled to get the hell out of my county and don't come back. That's what you're entitled to. . . . Now, sit there and see if you can get some damn sense in your head." *Id.* at 3. During J.A.'s interaction with Defendant, J.A. was surrounded by law enforcement personnel, was handcuffed most of the time, and

never posed a threat to anyone. *Id.* at 4. Following the interaction, J.A. was strapped into a restraint chair "for hours" per Defendant's orders. *Id.* at 5. There was no legitimate, nonpunitive, governmental purpose for use of the restraint chair, which caused J.A. physical pain and bodily injury. *Id.* at 11.

C.H. was apprehended by a CCSO deputy. *Id.* at 4. He was unarmed, not under the influence of drugs, and offered no resistance. *Id.* The deputy spoke with Defendant, texted Defendant a photograph of C.H. handcuffed and seated in a patrol car, and had this text-message exchange with Defendant:

Defendant: How old is he?

Deputy: 17

Defendant: Chair

*Id.* at 4–5. A few hours later, C.H. was booked into the jail. *Id.* at 5. Although he was compliant with law enforcement and never posed a threat to anyone, C.H. was strapped into a restraint chair and left there for "several hours" per Defendant's orders. *Id.* There was no legitimate, nonpunitive, governmental purpose for use of the restraint chair, which caused C.H. physical pain and bodily injury. *Id.* at 11.

J.H. was arrested following a domestic disturbance, with possible drug use. *Id.* at 5. He pretended to pass out at the police station and was transported to the

hospital, where he refused treatment and left. *Id.* at 5. He was later re-arrested, at which time he did not cooperate with officers or comply with their commands, and he had to be carried down some stairs and placed in a patrol vehicle. *Id.* at 5–6. He was later booked into the jail, where he was not combative and did not pose a threat to anyone. *Id.* at 6. He was strapped into a restraint chair and left there for "several hours" per Defendant's hours. *Id.* During that time, he was not allowed to go to the restroom, and he urinated on the chair. *Id.* Defendant addressed J.H., who happened to be sitting next to C.H., stating "If I hear about you (C.H.) messing up your mama's house again, if I hear about you (J.H.) fighting cops and faking and going to the [hospital] and then walking out and pulling out the IV, I'm a sit your ass in that chair for sixteen hours straight. Do you understand me? I need to hear from both of y'all that y'all not gonna show y'all's ass in my county no more." *Id.* at 7. There was no legitimate, nonpunitive, governmental purpose for the use of the restraint chair, which caused J.H. physical pain and bodily injury. *Id.* at 12.

G.H. had a dispute with a CCSO deputy over some landscaping work that G.H. did for the deputy. *Id.* at 7. The work and dispute were unrelated to the deputy's employment with the CCSO. *Id.* Defendant and G.H. engaged in several communications regarding the work and why G.H. was harassing the deputy, and

4

Defendant ultimately instructed a CCSO deputy to swear out a misdemeanor arrest warrant against G.H. for harassing communications. *Id.* at 7–8. Defendant texted G.H. on April 24, 2020, asking if G.H. would like to turn himself in, and again on April 25, instructing G.H. that he could not turn himself in whenever he wanted to and that he needed to do so that day. *Id.* at 8. G.H. turned himself in on April 27, at which time he offered no resistance and appeared complaint and cooperative with jail personnel. *Id.* at 8–9. Defendant arrived, at which time G.H. was surrounded by law enforcement personnel, remained compliant, and never posed a threat to anyone. *Id.* at 9. Defendant ordered that G.H. be strapped into a restraint chair "for several hours" without any legitimate, nonpunitive, governmental purpose, which caused G.H. physical pain and bodily injury. *Id.* at 9, 13.

W.T. was arrested for speeding and having a suspended license. *Id.* at 9. When he arrived at the jail, he was met by Defendant and members of the CCSO Scorpion Response Team (SRT). *Id.* W.T. was not physically aggressive and did not pose a threat to anyone. *Id.* Defendant ordered SRT deputies to strap W.T. into a restraint chair, where he was left for "several hours" per Defendant's orders. *Id.* While W.T. was in the chair, and while Defendant was present, a CCSO employee covered W.T.'s head with a hood. *Id.* at 10. Just after W.T.'s head was covered, his

face was struck twice by what he believes was a fist, and the strikes caused W.T.

to bleed. *Id.* At some point later, while still in the restraint chair, a CCSO deputy

asked W.T. if he was "the one they beat up?" *Id.* The deputy covered the blood on

W.T.'s jail uniform with a smock and took a photograph of W.T. *Id.* W.T. was not

allowed to use the restroom while he was restrained, and he urinated on the chair.

*Id.* There was no legitimate, nonpunitive, governmental purpose for strapping

W.T. into a restraint chair. *Id.* at 14.

## II.   Analysis

### A. Motion to Dismiss the Indictment

The Federal Rules of Criminal Procedure provide that an indictment "must

be a plain, concise, and definite written statement of the essential facts constituting

the offense charged." Fed. R. Crim. P. 7(c)(1). "An indictment is sufficient if it (1)

presents the essential elements of the charged offense, (2) notifies the accused of

the charges to be defended against, and (3) enables the accused to rely upon a

judgment under the indictment as a bar against double jeopardy for any

subsequent prosecution for the same offense." *United States v. Chalker*, 966 F.3d

1177, 1190 (11th Cir. 2020) (internal quotation marks omitted). "And when an

indictment specifically refers to the statute on which the charge was based, the

reference to the statutory language adequately informs the defendant of the

charge." *Id.* (internal quotation marks omitted). "Nevertheless, even when an indictment 'tracks the language of the statute, it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense with which he is charged.'" *United States v. Durrett*, 524 F. App'x 492, 493 (11th Cir. 2013) (alteration omitted) (quoting *United States v. Bobo*, 344 F.3d 1076, 1083 (11th Cir. 2003)).

In judging the sufficiency of an indictment, the Eleventh Circuit has cautioned that courts should give the charging document "a common sense construction, and its validity is to be determined by practical, not technical, considerations." *Chalker*, 966 F.3d at 1190 (internal quotation marks omitted). In considering a motion to dismiss, the court "is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes." *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006) (emphasis in original). This is so because "a court may not dismiss an indictment on a determination of facts that should have been developed at trial." *Id.* (internal quotation marks and alteration omitted); *see also United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. 2004) (noting that there "is no summary judgment procedure in criminal cases" and that the Federal Rules of Criminal Procedure do not provide "for a pre-trial determination of sufficiency of the evidence" (internal quotation marks omitted)).

The superseding indictment[1] contains five counts, each charging a violation of 18 U.S.C. § 242. "Section 242 is a Reconstruction Era civil rights statute making it criminal to act (1) willfully and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States." *United States v. Lanier*, 520 U.S. 259, 264 (1997) (internal quotation marks and footnote omitted); *see also United States v. Brown*, 934 F.3d 1278, 1294 (11th Cir. 2019) (same). As to the third element, which is the only one Defendant challenges, criminal liability "may be imposed for deprivation of a constitutional right if, but only if, in light of pre-existing law the unlawfulness under the Constitution is apparent." *Lanier*, 520 U.S. at 271–72 (internal quotation marks and alteration omitted). This is so because a defendant is entitled to "fair warning . . . of what the law intends to do if a certain line is passed." *Id.* at 265 (internal quotation marks omitted). In other words, it must be "reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267.

---

[1] "Filing a superseding indictment has the same effect as dismissing an original indictment and filing a new indictment . . . ." *United States v. McKay*, 30 F.3d 1418, 1420 (11th Cir. 1994). As such, the motion to dismiss the original indictment, (Doc. 20), should be **DENIED AS MOOT**. *See United States v. Taylor*, No. 1:18-CR-425-SCJ, 2019 WL 3891854, at *1 (N.D. Ga. Aug. 19, 2019) ("The superseding indictment renders the original motion to dismiss **MOOT**.")

The standard that the Supreme Court has articulated for determining whether pre-existing law makes clear that the charged conduct violates the law is the same as the "clearly established" standard that applies for determining whether a defendant is entitled to qualified immunity in the context of a civil claim under 42 U.S.C. § 1983. *See id.* at 270–72. The Court explained why in these terms:

> In the civil sphere, we have explained that qualified immunity seeks to ensure that defendants reasonably can anticipate when their conduct may give rise to liability, by attaching liability only if the contours of the right violated are sufficiently clear that a reasonable official would understand that what he is doing violates that right. So conceived, the object of the "clearly established" immunity standard is not different from that of "fair warning" as it relates to law "made specific" for the purpose of validly applying § 242. The fact that one has a civil and the other a criminal law role is of no significance; both serve the same objective, and in effect the qualified immunity test is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes. To require something clearer than "clearly established" would, then, call for something beyond "fair warning."

*Id.* at 270–71 (internal quotation marks, citations, and alterations omitted); *see also id.* at 269 (holding that prior decisions, including those with "notable factual distinctions" from the conduct at issue, may provide fair warning so long as they "gave reasonable warning that the conduct then at issue violated constitutional rights"). A right can be "clearly established" by "(1) case law with

9

indistinguishable facts, (2) a broad statement of principle within the Constitution, statute, or case law, or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) (internal quotation marks omitted). So then, the question boils down to whether—based on the facts alleged in the superseding indictment (as opposed to the facts that Defendant anticipates might come out at trial)—pre-existing law gave reasonable warning that Defendant's conduct violated constitutional rights.

The superseding indictment alleges that each of the five detainees were deprived of "the right to be free from the use of unreasonable force by law enforcement officers." (Doc. 24 at 10–14). The right to be free from excessive force can, depending on the status of the victim, come from one of three constitutional provisions: the Fourth, Eighth, and Fourteenth Amendments. *Crocker*, 995 F.3d at 1246. "[T]he Fourth Amendment covers arrestees, the Eighth Amendment covers prisoners, and the Fourteenth Amendment covers those who exist in the in-between—pretrial detainees." *Id.* (internal quotation marks omitted). The line is not always clear, however, "as to when an arrest ends and pretrial detainment begins." *Id.* at 1247 (internal quotation marks omitted). As such, "[f]or someone who could plausibly be characterized as either an arrestee or a pretrial detainee,

it's hard to say whether the Fourth or Fourteenth Amendment should govern the analysis." *Id.* Luckily, "inasmuch as it entails an inquiry into the objective reasonableness of the officers' actions, the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment." *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 952–53 (11th Cir. 2019). As such, the Court first analyzes the counts under the Fourteenth Amendment (which applies to pretrial detainees), and concludes with a brief explanation about why the analysis is the same under the Fourth Amendment (which applies to arrestees).

The "appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). The Supreme Court has made clear "that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Id.* (internal quotation marks omitted). And because a pretrial detainee may not be punished (he has, after all, not been convicted of anything yet), any force used against him that is "more severe than is necessary to subdue him or otherwise achieve a permissible governmental objective" is "punishment" and therefore unconstitutional. *Piazza*, 923 F.3d at 952. Stated differently, "because force in the pretrial detainee context may be defensive or preventative—but never punitive—

11

*the continuing use of force is impermissible when a detainee is complying, has been forced to comply, or is clearly unable to comply." Id.* at 953 (emphasis added).

And this proposition of law—that a law enforcement officer may not use force against a detainee who is complying—is neither novel nor new. In *Piazza*, the Eleventh Circuit noted that "for decades our decisions have embraced and reiterated the principle that an officer may not continue to use force after a detainee has clearly stopped resisting." 923 F.3d at 955–56 (citing *Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008) ("Once a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need."), *abrogated on other grounds by Kingsley*, 576 U.S. at 397; *then Skritch v. Thornton*, 280 F.3d 1295, 1303 (11th Cir. 2002) ("[G]overnment officials may not use gratuitous force against a prisoner who has been already subdued or, as in this case, incapacitated."); *then Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991) ("The basic legal principle is that once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments."); *and then Ort v. White*, 813 F.2d 318, 327 (11th Cir. 1987) ("A [F]ourteenth [A]mendment violation occurs . . . where prison officers continue to employ force or other coercive measures after the necessity for such coercive action has ceased.")).

12

Viewed against that standard and the facts alleged in the indictment, Defendant's motion to dismiss should be denied. Again, the superseding indictment makes clear that every one of the detainees was complying with the deputies' commands when Defendant ordered them into a restraint chair. (Doc. 24 at 4 (alleging that J.A. was surrounded by law enforcement personnel, was handcuffed most of the time, and never posed a threat to anyone), at 5 (alleging that C.H. had been compliant with law enforcement and never posed a threat to anyone), at 6 (alleging that J.H. was not combative and never posed a threat), at 9 (alleging that G.H. was surrounded by law enforcement personnel, remained compliant, and never posed a threat), at 10 (alleging that W.T. was not physically aggressive and never posed a threat to anyone)). And it further alleges that Defendant caused each of the five to be restrained "without any legitimate nonpunitive governmental purpose." *Id.* at 11–14. Simply put, the superseding indictment alleges that Defendant used force against pretrial detainees who were complying with law enforcement instructions. Those allegations, for purposes of a motion to dismiss, are enough. *See Piazza*, 923 F.3d at 953 (noting that "our decisions make one thing clear: Once a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need" (internal quotation marks omitted)).

13

Defendant argues that this broad statement of law [2] is insufficient. He maintains that there is no case law making clear that the use of restraint chairs amounts to the use of force at all, let alone excessive force. (Doc. 20 at 8–15). He suggests that the only cases from within the Eleventh Circuit dealing with restraint chairs also involved some other type of force, *id.* at 9–10, and that absent such on-point, within-the-four-corners-of-the-indictment, restraint-chair-only case, he did not have fair notice that his conduct was illegal, *id.* at 10.

The Court is unpersuaded. First, the Court simply cannot agree that placing someone in restraints, to a degree that they cause physical pain and bodily injury (as is alleged as to each of the detainees), does not amount to the use of "force." In *Williams v. Burton*, the Eleventh Circuit addressed a scenario where a prisoner who was causing a disturbance (yelling, spitting, threatening, throwing bodily fluids)

---

[2] Again, a right can be clearly established based on "(1) case law with indistinguishable facts, (2) a broad statement of principle within the Constitution, statute, or case law, or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Crocker*, 995 F.3d at 1240 (internal quotation marks omitted). Here, the Court finds an applicable broad statement of the law regarding the use of force with detainees who are not resisting, as noted above. As such, the Court does not consider whether there might also be case law with indistinguishable facts (the Court is not aware of any such case law, nor have the parties identified any) or whether this conduct is so egregious that the right could be deemed clearly established even in the total absence of case law.

14

was placed in a four-point restraint and his mouth was covered with tape for about twenty-eight hours (with some brief intervals for eating, exercising, and using the toilet). 943 F.2d at 1574. The prisoner alleged (among other things) that the use of the restraints for such a long period of time amounted to punishment, in violation of the Eighth and Fourteenth Amendments. *Id.* at 1575–76. The Eleventh Circuit noted that it was somewhat of a "difficult" question as to whether the restraints—which it found were clearly justified in the first place—were used for too long of a period of time. *Id.* Critically, the court never questioned that the use of the four-point restraints amounted to the use of force—it simply wrestled with whether that force was used for too long a period of time. The court framed the inquiry in this way:

> Once restraints are initially justified, it becomes somewhat problematic as to how long they are necessary to meet the particular exigent circumstances which precipitated their use. The basic legal principle is that once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments, and any abuse directed at the prisoner after he terminated his resistance to authority is an Eighth Amendment violation.

*Id.* The court ultimately found that, given the prisoner's history of disobedience and the potential for him to incite others, the use of the restraints for as long as they were used was not a constitutional violation. *Id.* at 1576–77. But again, the key

15

take-away from *Williams* is that the use of a four-point restraint amounted to force. It was a use of force that did not violate the Constitution given the facts of that case, but was a use of force nonetheless. I see no meaningful distinction between the four-point restraint in *Williams* and the restraint chair here—they are both external restraints used to prevent a detainee from moving. As such, Defendant's argument that putting someone in a restraint chair for hours, in a manner sufficient to cause pain and injury, does not amount to force *at all* fails to carry the day.

Nor is it problematic that there are no excessive force cases involving restraint chairs (as opposed to tasers or punches or any other type of force). (*See* Doc. 20 at 10–15). Indeed, the Eleventh Circuit made this very point in *Piazza*. In that case, an inmate (who officers were attempting to move to a new cell) ran away from the officers and grabbed a shower curtain. 923 F.3d at 950. An officer tased him, and he fell to the floor unresponsive. *Id.* The officer then ordered him to roll over, which he did not do, and the officer tased him again. *Id.* The court held that the officer was not entitled to qualified immunity because he used force (the *second* application of the taser) after the inmate had stopped resisting. *Id.* at 955–56. In doing so, the court relied on its prior excessive force cases (*Danley*, *Skritch*, *Williams*, and *Ort*), none of which happened to involve tasers, for the proposition that those cases "embraced and reiterated the principle that an officer may not

16

continue to use force after a detainee has clearly stopped resisting." *Id.* And the

court made clear that the fact that those cases did not happen to involve a taser

did not in any way lessen their ability to "clearly establish" the relevant law:

> To be clear, it is no answer to say that *Danley* involved pepper spray, *Skritch* kicks and punches, *Williams* four-point restraints, etc.—and that none of those cases concerned the use of a taser specifically. It's true, of course, that to defeat qualified immunity a rule must be specific enough that an act's unlawfulness follows immediately from the conclusion that the rule was firmly established. But we have never suggested that the longstanding prohibition on a jail officer's use of force on an incapacitated detainee turns on as fine a point as the particular weapon deployed.

*Id.* at 956 (internal quotation marks, alteration, and citation omitted). Simply put,

there need not be a prior case involving restraint chairs for it to be "reasonably

clear," *Lanier*, 520 U.S. at 267, that Defendant's use of the restraint chair in this case,

against detainees who were not resisting, amounted to criminal conduct. *Piazza* is

one of the more recent in a decades-old line of cases that gave Defendant the notice

to which he is required: "that an officer may not continue to use force after a

detainee has clearly stopped resisting." 923 F.3d at 955.[3]

---

[3] Defendant suggests that this case is different because it involves the use of "passive restraint" in a chair. (Doc. 39 at 4). This argument seems to hinge on Defendant's related argument that the use of a restraint chair is not force at all. But as noted above, that argument fails to carry the day. And as the Eleventh Circuit has made clear, force is force, whether in the form of a punch, spray, taser, or restraint. *Piazza*, 923 F.3d at 956. There is no meaningful distinction between what

Defendant argues that, for a "general rule" to show that a law is clearly established, the rule must apply "with obvious clarity to the circumstances." (Doc. 20 at 12 (quoting *Crocker*, 995 F.3d at 1240 (internal quotation marks and emphasis omitted))). Here the general rule—that an officer may not continue to use force against a detainee who has clearly stopped resisting—squares with the allegations in the superseding indictment. Again, the charging document makes clear that, as to each detainee, Defendant ordered the use of force, without any legitimate purpose, against individuals who were not resisting and did not pose a threat. Those allegations are sufficient to survive a motion to dismiss.

Defendant points to *Crocker*, where the Eleventh Circuit held that a sheriff's deputy was entitled to qualified immunity after leaving an arrestee in a hot patrol car for somewhere between 22 and 30 minutes. 995 F.3d at 1238. There the court considered six non-exclusive, non-exhaustive factors that the Supreme Court identified in *Kingsley* for determining whether force is excessive for purposes of the Fourteenth Amendment: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity

_____

Defendant terms "passive" force (restraining someone for hours) and more "active" force (punching someone in the face, for example).

18

of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Id.* at 1250–51. The court determined that the amount of force used (putting the arrestee in a hot car on the side of a Florida highway for less than 30 minutes) was slight and there was essentially no harm done to the plaintiff. *Id.* at 1251 (noting that there is a *de minimis* "level of imposition with which the Constitution is not concerned"). The court feared that if those facts amounted to a violation, then every arrestee placed into a hot patrol car in Alabama, Florida, and Georgia would have a similar cause of action—all in the face of no real injury (the plaintiff in *Crocker* "endured some discomfort" but needed no medical attention). *Id.* at 1251–52. The facts in *Crocker* are not terribly helpful to the analysis here because, in that case, there was some need for the use of force—the officer had to restrain the arrestee by placing him in the squad car in order to transport him to jail. Here, as the indictment alleges, there was no need for the use of force at all—each of the detainees was compliant and not resisting. Therefore, *any* use of force was unconstitutional. *See Piazza*, 923 F.3d at 955. Indeed, the *Kingsley* factors themselves—which are aimed towards determining whether a particular use of force was excessive—are somewhat of an imperfect guide here where, given the allegations in the indictment, *any* use of force was impermissible. The factors are rather fact-intensive and lend themselves

19

more to the summary judgement analysis the court faced in *Crocker* or the post-trial analysis in *Kinsley* itself. Nevertheless, to the extent they are helpful here, they all suggest that Defendant's motion to dismiss should be denied. Based on the allegations in the indictment, there was no need for the use of force at all, the detainees were injured as a result of the use of force, the force was not used in response to any security problem at the jail, the detainees were not a threat to anyone, and they were not resisting.[4]

Defendant also points to two recent decisions from the Supreme Court, *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021), and *City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021), for the proposition that "[h]ighly general proscriptions that bar excessive force amounting to punishment under circumstances very different than those faced by" Defendant are not sufficient to have put him on notice that his conduct was unlawful. (Doc. 41 at 3). The Court does not find either case particularly instructive here. In *Rivas-Villegas*, an officer placed his knee on the

---

[4] Nor, by denying Defendant's motion to dismiss, is the Court second-guessing Defendant's choices in how he runs the jail. (Doc. 20 at 15–17). A trier of fact will ultimately determine whether Defendant's actions violated the charged criminal statutes. At this stage, all the Court is holding is that the allegations in the superseding indictment present the essential elements of the charged offenses, notify Defendant of the charges to be defended against, and enable him to rely upon a judgment as a bar against double jeopardy for any subsequent prosecution. Nothing more and nothing less.

back of a suspect—for no more than eight seconds—while other officers removed a knife from the suspect's pocket. 142 S. Ct. at 8–9. The officers encountered the suspect in response to a domestic violence complaint possibly involving a chainsaw. *Id.* The Court held that a prior circuit case involving an officer digging his knee into the back of an unarmed suspect when responding to a noise complaint, who did not threaten the officers, was not sufficiently similar so as to clearly establish that the defendant's actions were unlawful. *Id.* The fact-specific analysis in that case, which was decided at summary judgment, does not help Defendant here. The proposition of law the Court relies upon in this case—that an officer may not continue to use force after a detainee has stopped resisting—stems from decades of Eleventh Circuit precedent. *See Piazza*, 923 F.3d at 955–56. And the allegations in the superseding indictment place this case squarely within that precedent—the detainees were not threatening or resisting, and Defendant used force against them. *Rivas-Villegas* requires nothing more. *See* 142 S. Ct. at 7–8 (noting that the Supreme Court's "case law does not require a case directly on point for a right to be clearly established" so long as "existing precedent . . . placed the statutory or constitutional question beyond debate") (internal quotation marks omitted)).

21

*City of Tahlequah* is similar. There too the Court engaged in a fact-specific inquiry, following a district court's resolution of the case at summary judgment, to determine that no case clearly established that the defendant's actions were unlawful. In that case, police officers shot a man who was not complying with their commands to stop, and who raised a hammer behind his back and took a stance as if he was about to throw the tool or charge at the officers. 142 S. Ct. at 10–11. The Court distinguished the cases the Tenth Circuit had relied upon—two of which involved a suicidal suspect and aggressive officers, and the other was dismissed for lack of jurisdiction—and reiterated that "[i]t is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 11–12 (internal quotation marks omitted). Here, as explained above, the allegations in the indictment fit within the Eleventh Circuit's well-defined case law precluding the use of force against a detainee who has stopped resisting. Again, the Court considers this case in the posture of a motion to dismiss the superseding indictment, where the allegations in that document are accepted as true and are the entirety of the facts available for consideration. The Court offers and decides nothing about what a trier of fact might later conclude

upon consideration of the evidence at trial. [5] For present purposes, the superseding indictment is sufficient, and the motion to dismiss, (Doc. 33), should be **DEINED**.

### B. Motion to Strike Surplusage

Within the motion to dismiss, Defendant also seeks to strike certain paragraphs from the superseding indictment. (Doc. 33 at 2–3). Federal Rule of Criminal Procedure 7(d) authorizes a court to "strike surplusage from the indictment." "A motion to strike surplusage from an indictment should not be granted unless it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial. This is a most exacting standard." *United States v. Awan*, 966 F.2d 1415, 1426 (11th Cir. 1992) (internal quotation marks and alterations omitted). As such, "to prevail on a motion to strike surplusage, a defendant must show, first, that the contested portions of the indictment are irrelevant to the charged crimes, and, second, that the challenged language is unfairly prejudicial or inflammatory." *United States v. Anyanwu*, No. 1:12-CR-190-

---

[5] The analysis would be the same under the Fourth Amendment, which applies to arrestees. The Eleventh Circuit has noted that "the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment," *Piazza*, 923 F.3d at 953, and neither party offers any argument for why the result here would be different under the Fourth Amendment than it would be under the Fourteenth.

TWT-ECS-1, 2013 WL 1558712, at *4 (N.D. Ga. Mar. 12, 2013), *adopted by* 2013 WL 1561011 (N.D. Ga. Apr. 12, 2013). And, "to determine whether the allegations are relevant to the charges and the evidence introduced at trial, the Court may reserve ruling on a motion to strike surplusage until hearing the evidence and determining its relevance at trial." *United States v. Webman*, No. 1:13-CR-25-SCJ, 2014 WL 835988, at *4 (N.D. Ga. Mar. 4, 2014) (internal quotation marks and alteration omitted).

Defendant seeks to strike paragraphs 46–49 of the superseding indictment, which relate to detainee W.T. Those paragraphs allege that after W.T. was strapped into the restraint chair, and while Defendant was still present, a CCSO employee covered W.T.'s head with a hood. (Doc. 24 at 10, ¶ 46). The superseding indictment alleges that after W.T.'s head was covered, his face was struck by what he believed was a closed fist, which caused him to bleed. *Id.* at ¶ 47. An officer later covered the blood on W.T.'s jail uniform with a white paper smock and took a photograph of W.T. *Id.* at ¶ 48. While he was in the restraint chair, W.T. was not allowed to go to the restroom, and he urinated on the chair. *Id.* at ¶ 49.

Defendant argues that there is no allegation that he is the one who struck W.T., or that he directed, encouraged, or in any way facilitated any other person striking the detainee. (Doc. 33 at 2). He notes that he is charged as a principal (as

24

opposed to a conspirator or an aider and abettor), and that the conduct is therefore irrelevant to his guilt and inflammatory. *Id.* The Government responds by arguing that how the detainees were treated while in the chairs is relevant to determining whether the chairs were used to respond to an exigent circumstance or, rather, were used as unjustified punishment. (Doc. 35 at 22). It further argues that the challenged allegations are relevant to determining Defendant's intent and whether he acted willfully. *Id.* at 22–23. The Government maintains that the allegations are not inflammatory or unfairly prejudicial because the jurors are entitled to know how the detainees were treated at Hill's orders and/or in his presence. *Id.* at 23.

At this stage, Defendant has not demonstrated that the challenged paragraphs are irrelevant or that they are unfairly prejudicial or inflammatory. Critically, the superseding indictment alleges that Defendant was present when W.T.'s head was covered with a hood. (Doc. 24 at 10, ¶ 46). As such, the jury may be able to infer something from this evidence about why he ordered W.T. to be strapped into the chair. Moreover, the Court cannot conclude that the information is unfairly prejudicial or inflammatory because, again, at least some of it occurred while Defendant was present, and it could therefore be relevant to his intent. As such, the motion should be **DENIED**.

25

I make this recommendation based on the limited allegations alleged in the superseding indictment, however. The relevancy could be greater or lesser depending on other things like, for example, whether Defendant was also present when the detainee was struck (as opposed to just being present when the mask was placed on his face). As such, and because the Court has the discretion to reserve ruling on a motion to strike surplusage until after it hears the evidence at trial and can better determine the relevancy, I further recommend that the Court deny the motion without prejudice so that that Defendant has the opportunity to raise the issue again at trial when the relevancy may be more clear.

### C. Motion for a Bill of Particulars

Defendant filed a motion for a bill of particulars as to the original indictment. (Doc. 21). Because the grand jury returned a superseding indictment, the motion for a bill of particulars as to the original indictment, (Doc. 21), is **DENIED AS MOOT**. *See McKay*, 30 F.3d at 1420 ( "Filing a superseding indictment has the same effect as dismissing an original indictment and filing a new indictment . . . .").

Defendant also filed a motion for a bill of particulars as to the superseding indictment, where he requests that the Government be ordered to identify the

26

specific "physical pain" and "bodily injury" suffered by the detainees identified in Counts 1–4. (Doc. 32). For the reasons set forth below, that motion is **DENIED**.

"The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *United States v. Davis*, 854 F.3d 1276, 1293 (11th Cir. 2017) (internal quotation marks omitted). "A bill of particulars may not be used to obtain a detailed disclosure of the government's evidence prior to trial," nor is a defendant entitled to one "where the information sought has already been provided by other sources, such as the indictment and discovery." *Id.* (internal quotation marks omitted). A bill of particulars "is not a general tool of discovery, nor is it a device to give the defense a road map to the government's case." *United States v. Leiva-Portillo*, No. 1:06-CR-350-WSD, 2007 WL 1706351, at *14 (N.D. Ga. June 12, 2007). Instead, a bill of particulars "supplements an indictment by providing the defendant with information *necessary* for trial preparation." *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986) (emphasis in original). It is appropriate where the indictment "fails to set forth specific facts in support of requisite elements of the charged offense, and the information is essential to the defense." *United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985). "Courts have

routinely denied requests for bills of particulars concerning the 'wheres, whens and with whoms' of the crime." *United States v. Bonventre*, No. 10 Cr. 228(LTS), 2013 WL 2303726, at *6 (S.D.N.Y. May 28, 2013), *aff'd*, 646 F. App'x 73, 78–79 (2d Cir. 2016).

The statutory maximum punishment for violating 18 U.S.C. § 242 is one year in prison unless "bodily injury" results from the acts or the acts include the use or attempted use of a dangerous weapon, explosives, or fire—in which case the statutory maximum is ten years in prison (there is also a provision that raises the statutory maximum to life or death, which is not relevant here). 18 U.S.C. § 242. The statute does not define "bodily injury," so the Eleventh Circuit has looked to how that term is defined in other federal statutes and has held, for purposes of Section 242, that it means: (A) a cut, abrasion, bruise, burn, or disfigurement; (B) physical pain; (C) illness; (D) impairment of a function of a bodily member, organ, or mental faculty; or (E) any other injury to the body, no matter how temporary. *United States v. Myers*, 972 F.2d 1566, 1572–73 (11th Cir. 1992); *see also* Eleventh Circuit Pattern Jury Instructions (Criminal Cases) § O8 annotations and comments (noting that the Eleventh Circuit approved of this definition of "bodily injury" in *Myers*).

Defendant argues that the superseding indictment does not specify the *type* of pain or bodily injury suffered by J.A. (Count One), C.H. (Count Two), J.H. (Count Three), or G.H. (Count Four). Without that information, he maintains, he cannot explore whether there might be alternate causes for any alleged injuries nor can he determine whether he needs an expert witness (he posits the possibility of a medical expert) to assist with his defense. (Doc. 32 at 4–5). The Government counters that the indictment sufficiently alleges that each detainee suffered physical pain that resulted in bodily injury, and that those allegations are sufficient to allow Defendant to prepare his defense. (Doc. 35 at 24). Moreover, the Government alleges that the discovery it has provided gives Defendant further details, including that:

- J.A. felt pain in both of his hands and legs and, after being removed from the restraint chair, he had visible red marks on both of his wrists and ankles;

- C.H. felt pain in his arms, back, and ankles during and after confinement in the chair; that he had difficultly walking when he was removed from the chair; and that he had visible marks on both of his wrists and ankles from the straps that secured him to the restraint chair;

- J.H. suffered a sprained wrist from the handcuffs being too tight; and

29

- G.H.'s hands were black and blue after being removed from the chair, he could barely walk after being removed from the chair, his hands were numb, he had cramping in both of his shoulders, he could feel a pull between his neck and shoulder, his right arm was numb to the wrist, his left arm was numb from the elbow to the wrist, and he experienced a shocking sensation through his nerves on the left arm.

(Doc. 35 at 25 n.6). Defendant maintains that the information in discovery is not sufficient, noting, for example, that a sprain requires a medical diagnosis, and there is not other evidence that J.H. suffered such a sprain. (Doc. 39 at 8). He argues that the Government should be forced to commit to a theory regarding how it will demonstrate bodily injury now and that, if it intends to rely on anything other than physical pain, it should have to explain what physical injuries the detainees suffered. *Id.* at 8–9.

Defendant has failed to demonstrate that the information he seeks is *necessary* for his trial preparation. The indictment alleges that each of the detainees suffered "physical pain" as a result of being strapped into the restraint chair. And physical pain is one of the methods available to the Government to demonstrate bodily injury. *See Myers*, 972 F.2d at 1572–73.

Additionally, the Government has provided Defendant with individualized discovery as to each of the detainees relevant to Counts 1–4 (the only ones as to which Defendant seeks a bill of particulars) that describes in some detail the pain that they each felt, as well as the physical manifestations of such pain (red marks, numbness, difficulty walking, bruises, etc.). The fact that Defendant might wish for the Government to lay out its hand and provide in detail exactly how it will demonstrate bodily injury as to each of the detainees is simply not a reason to grant a request for a bill of particulars, particularly where the superseding indictment alleges that they each experienced pain and the discovery provides further details about that pain and the injuries the detainees suffered. It is not surprising, therefore, that courts around the country have routinely denied motions for "bodily injury" bills of particular related to charges under the statute charged in this case and others. *See United States v. Bell*, No. 17-cr-20183, 2020 WL 7382527, at *3–4 (E.D. Mich. Dec. 16, 2020) (denying a request for a bill of particulars detailing the "serious bodily injury" victims experienced in a drug case where the indictment alleged that each victim suffered serious bodily injury and the discovery offered further details regarding the injuries); *United States v. Brown*, No. 14 CR 674, 2016 WL 806552, at *5 (N.D. Ill. Mar. 2, 2016) (denying a motion for a bill of particulars seeking the "precise description" of the "bodily injury" a victim

31

suffered in a § 242 prosecution); *United States v. Isch*, No. CR-09-040-D, 2009 WL 2409578, at *4 (W.D. Okl. Aug. 3, 2009) (denying a motion for a bill of particulars seeking information about the bodily injury in a § 242 case and noting that the allegation of bodily injury, which relates only to punishment, is not an essential element of a § 242 charge); *United States v. Passaro*, No. 5:04-CR-211-1-BO, 2006 WL 8439896, at *4 (E.D.N.C. Mar. 23, 2006) (denying a motion for a bill of particulars directing the government to specify the serious bodily injury it intended to prove at trial in an assault case where the indictment tracked the language of the statute and the statute defined "serious bodily injury"); *United States v. Livoti*, 8 F. Supp. 2d 246, 249–50 (S.D.N.Y. 1998) (denying a motion for a bill of particulars for the bodily injury a victim suffered in a § 242 case where the government produced a death certificate, autopsy report, and medical records).[6]

---

[6] I have identified one case where a court ordered a bill of particulars regarding bodily injury. *See United States v. Darden*, 346 F. Supp. 3d 1096, 1123–24 (M.D. Tenn. 2018) (ordering a bill of particulars regarding the serious bodily injury a victim suffered as to a RICO assault count). The court ordered the bill of particulars to "clarify any potential confusion" because the Government alleged that the victim at issue was shot by a co-defendant, leaving questions as to what serious bodily injury the defendant allegedly caused. *Id.* Here, there is no similar confusion regarding who caused the bodily injury alleged in the superseding indictment.

The Court appreciates that it might be helpful for Defendant to know precisely how the Government will demonstrate bodily injury at trial as to each of the detainees and, specifically, whether the Government will rely on something other than physical pain. But physical pain alone is sufficient, the Government has alleged pain as to each detainee, and it has provided details regarding that pain (as well as certain other bodily injuries) in discovery.[7] Given that, "the only purpose a bill of particulars would serve is to lock the Government into a trial strategy far in advance of the trial date," and that is not an appropriate purpose. *Bell*, 2020 WL 7382527, at *4. The motion for a bill of particulars, (Doc. 32), is **DENIED**.

## III.   Conclusion

For the reasons stated above, the motion for a bill of particulars as to the original indictment, (Doc. 21), is **DENIED AS MOOT**, and the motion for a bill of

---

[7] The Government cites FBI reports of interviews with the detainees where they describe their pain and injuries. Several of the cases denying bills of particular noted above rely in part on the fact that the Government had produced medical records in discovery. The Government has not indicated one way or the other whether it possesses any medical records related to the pain or injuries the detainees allegedly suffered or, if it does, whether those records have been produced. If the Government has any such medical records, it should produce them to Defendant or, if it believes they should be withheld, present them to the Court for *in camera* review.

particulars as to the superseding indictment, (Doc. 32), is **DENIED**. Further, I recommend that the motion to dismiss the original indictment, (Doc. 20), be **DENIED AS MOOT** and that the motion to dismiss the superseding indictment and to strike surplusage, (Doc. 33), be **DENIED**. There are no other pretrial motions pending before the undersigned, and this case is **CERTIFIED READY FOR TRIAL**.

   **IT IS SO ORDERED and RECOMMENDED,** this 29th day of December, 2021.

_____
CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE